UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**JAMES S. LEGORE**,

        Plaintiff,

v.

**CAROLYN W. COLVIN**,
Acting Commissioner of Social Security,

        Defendant.

Civil Case No. 3:13-CV-01249-KI

OPINION AND ORDER

    George J. Wall
    1336 E. Burnside Street, Suite 130
    Portland, Oregon  97214

        Attorney for Plaintiff

    S. Amanda Marshall
    United States Attorney
    District of Oregon

Page 1 - OPINION AND ORDER

Ronald K. Silver
Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97201-2902

Courtney Garcia
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington  98104-7075

    Attorneys for Defendant

KING, Judge:

Plaintiff James S. Legore brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for supplemental security income benefits ("SSI").[1] I reverse the decision of the Commissioner and remand for further proceedings.

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

---

[1] At the hearing, Legore amended his alleged onset date to December 8, 2010, which effectively withdrew his application for disability insurance benefits ("DIB").

cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the Administrative Law Judge ("ALJ"). The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d), 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be

Page 3 - OPINION AND ORDER

disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, the ALJ makes a finding of "not disabled" and disability benefits are denied. 20 C.F.R. §§ 404.1520(e), 416.920(e).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is unable to perform other work. 20 C.F.R. §§ 404.1520(f), 416.920(f).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. Id. (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. Id.

## THE ALJ'S DECISION

The ALJ found Legore had severe impairments of a back disorder, learning disorder, and organic mental disorder. The ALJ also found that these impairments, either singly or in combination, were not severe enough to meet or medically equal the requirements of any of the

Page 4 - OPINION AND ORDER

impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  After reviewing the record, the ALJ found Legore had the residual functional capacity to perform medium work except he is only able to remember, understand, and carry out instructions and tasks which are generally required by occupations with a Specific Vocational Preparation ("SVP") level of 1-2.  Based on vocational expert testimony, the ALJ found Legore could perform his past work as a general assembler of truck vehicles or a power operator–bolt tightener.  As an alternative finding, the ALJ continued to step five and, referring to the Medical-Vocational Guidelines, found Legore had the capacity to perform substantially all of the medium unskilled occupations.  Based on either analysis, the ALJ found Legore was not disabled under the Act.

## FACTS

Legore alleges he became disabled on December 8, 2010, when he was 42 years old, due to back pain, pain and numbness in his hands and wrists, leg pain, headaches, and mental impairments, including a learning disorder affecting his ability to read.  He only attended high school for a year before dropping out, and he claims to be functionally illiterate.  Legore worked as a diesel mechanic and equipment maintenance person at a carnival and later assembled trucks at Freightliner for seven years.  He has not worked since Freightliner laid him off in 2001, and has been homeless since 2010.

After becoming homeless, Legore's days are filled with finding meals, panhandling, finding shelter for the evening, and helping with cleaning tasks at shelters.  He is unable to read or write and completed his SSI application forms by interview.  Legore complains of memory problems and has had difficulties following through on medical appointments.

# DISCUSSION

I.    <u>Medical Opinions</u>

Legore claims the ALJ improperly rejected the medical opinions of two examining psychologists, Dr. Gary Sacks and Dr. Lane DeWan.

The weight given to the opinion of a physician depends on whether the physician is a treating physician, an examining physician, or a nonexamining physician. More weight is given to the opinion of a treating physician because the person has a greater opportunity to know and observe the patient as an individual. <u>Orn v. Astrue</u>, 495 F.3d 625, 632 (9th Cir. 2007). If a treating or examining physician's opinion is not contradicted by another physician, the ALJ may only reject it for clear and convincing reasons. <u>Id.</u> (treating physician); <u>Turner v. Comm'r of Soc. Sec.</u>, 613 F.3d 1217, 1222 (9th Cir. 2010) (examining physician). Even if it is contradicted by another physician, the ALJ may not reject the opinion without providing specific and legitimate reasons supported by substantial evidence in the record. <u>Orn</u>, 495 F.3d at 632; <u>Turner</u>, 613 F.3d at 1222. "The opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." <u>Hill v. Astrue</u>, 698 F.3d 1153, 1160 (9th Cir. 2012) (internal quotation omitted).

    A.    <u>Psychologist Dr. Gary Sacks</u>

On February 23, 2011, Dr. Sacks performed a neuropsychological screening assessment to check Legore for a possible brain injury caused by physical abuse from his stepfather or a car accident at the age of 16 years. Dr. Sacks concluded Legore has a full scale IQ of 96. He scored in the low average range on most of the Wechsler Memory Scale subtests. Dr. Sacks diagnosed a learning disorder and cognitive disorder, both not otherwise specified. Dr. Sacks opined, in part:

> His spatial processing speed difficulties likely affect his ability to overcome illiteracy. His memory skills might limit his ability to master complex concepts, but his successful work for years as a mechanic and on an assembly line suggest physical difficulties are the primary cause of his occupational limits. His cognitive difficulties preclude jobs requiring reading, writing, and mastery of complex intellectual concepts.

Tr. 295.

Legore contends the ALJ improperly rejected one of Dr. Sacks' key findings–that Legore could not perform any work requiring reading or writing. Even though Legore's past work required the ability to read and write, according to the Dictionary of Occupational Titles ("DOT"), Legore explained to Dr. Sacks that Freightliner gave him time to memorize the repetitive job tasks. He also notes that all other treating and examining assessments in the record opine that he cannot read and write. In Legore's view, the fact that a job typically requires reading does not mean it always requires reading, and Freightliner accommodated his disability.

The Commissioner points to the portion of Dr. Sacks' opinion which did not find limitations in Legore's mental functioning, Legore's statement that he completed his GED using tapes, Legore's past work which required language levels consistent with a basic level of reading and writing, and Dr. DeWan's observation of Legore reading and writing simple sentences. The Commissioner claims several sources relied on Legore's self-reports that he could not read and did not perform testing.

Because the state agency reviewing psychologists disagreed with Dr. Sacks, the ALJ could reject his opinion by giving specific and legitimate reasons.

The ALJ gave significant weight to Dr. Sacks' opinion because it was consistent with the overall evidence and is supported by mental status and psychometric testing. Concerning

Dr. Sacks' opinion on Legore's ability to read and write, the ALJ reasoned that even though Legore had a longstanding history of problems reading and writing, the DOT lists GED language levels ranging from 1 to 2 for his past work, which the ALJ considered consistent with a basic level of reading and writing.  Because Legore performed successfully at Freightliner for seven years, the ALJ only limited Legore to the ability to remember, understand, and carry out instructions and tasks which are generally required by occupations with an SVP of 1-2.

> The GED language level of 2 consists of:
>
> Reading:  Passive vocabulary of 5,000-6,000 words.  Read at rate of 190-215 words per minute.  Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation.  Read instructions for assembling model cars and airplanes.
>
> Writing:  Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

Dictionary Of Occupational Titles, Appendix C: Components of the Definition Trailer, available at http://www.occupationalinfo.org/appendxc_1.html#III.  Level 1 is less skilled.

None of the case workers, treating medical sources, or examining medical sources have believed Legore was anything other than functionally illiterate.  Dr. DeWan observed Legore read and write simple sentences accurately but the process was "laborious."  Tr. 418.  Legore frequently brought mail to his case workers for them to read and explain the information to him.  Dr. DeWan explained the test requirements.  Most importantly, Legore explained Freightliner gave him time to memorize the job tasks; thus, he likely did not have to read instructions on the job.  Importantly, the ALJ did not question the vocational expert on whether Legore's past work matched the DOT classifications concerning reading and writing requirements or if he performed the work at a lower skill level.

Page 8 - OPINION AND ORDER

I find the ALJ did not provide legitimate reasons supported by substantial evidence in the record to reject Dr. Sacks' opinion that Legore could not perform jobs requiring reading and writing.

    B.    <u>Psychologist Dr. Lane DeWan</u>

Dr. DeWan examined Legore on November 13, 2012. He completed a Mental Residual Functional Capacity Assessment ("MRFCA"), concluding Legore had moderately severe limitations in eight areas within understanding and memory, sustained concentration and persistence, social interaction, and adaptation. The form defined "moderately severe" as:

> Indicates that the activity is not totally precluded [but] is substantially impaired in terms of speed or accuracy of carrying out the task, and can only be engaged in occasionally or so during an eight hour day; e.g., short duration (five-15 minutes), not totaling more than two hours in an eight-hour day.

Tr. 414.

Dr. DeWan noted Legore "read and wrote simple sentences accurately during the mental status exam and during the evaluation, but doing so appeared laborious." Tr. 418. He reviewed the testing documents aloud with Legore. Dr. DeWan diagnosed marked deficits in reading and writing ability, in the Low to Very Low range, but noted these scores were not commensurate with Legore's intellectual abilities and thus reflected learning disorders in reading and written expression. The doctor concluded Legore's reading and writing disorders would impede his ability to comprehend and respond to written instructions, to learn and retain new information via written materials, and to complete written tasks.

The ALJ gave little weight to Dr. DeWan's opinion because he completed a form similar to Section I of the MRFCA state agency form, which the ALJ characterized as "merely a

Page 9 - OPINION AND ORDER

worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the [residual functional capacity] assessment." Tr. 21. The ALJ was concerned that Dr. DeWan did not complete Section III of the MRFCA which gives a narrative explanation of the mental residual functional capacity assessment. The ALJ also did not think the ratings in Dr. DeWan's form were consistent with the state agency form.

The ALJ also gave little weight to Dr. DeWan's opinion to the extent Dr. DeWan opined Legore had more than moderate limitations in cognitive functioning. He relied on Legore's perfect score on the mini-mental state examination, psychometric testing consistent with someone who can perform the unskilled work Legore performed in the past, Dr. Sacks' test results of low average memory functioning, cognitive stamina demonstrated during a vocational evaluation in the fall of 2012, and Legore's leaving his last job because of a layoff and not due to his symptoms. To specifically address reading and writing, the ALJ stated, "[Legore's] longstanding writing and reading disorders also did not preclude the claimant from performing semi-skilled work as a chassis assembler or jobs with GED language requirements of one or two; they would also not preclude [him] from performing other medium unskilled work." Tr. 22.

Legore contends the ALJ's reasons to reject Dr. DeWan's opinions are insufficient. In Legore's view, Dr. DeWan's form was acceptable because he stated Legore's limitations in narrative form using clearly defined terms. Legore claims the ALJ based his opinion on a mini-mental status examination and ignored the other tests Dr. DeWan administered that support his opinion.

The Commissioner argues it is reasonable for the ALJ to discredit Dr. DeWan's opinion because she used a check-box form. The Commissioner also supports the ALJ's conclusion that

Page 10 - OPINION AND ORDER

Dr. DeWan's opinion was inconsistent with other evidence in the record and with Legore's work history.

I am unpersuaded by the ALJ's problems with Dr. DeWan's form. A doctor is not required to put her opinion on any particular form. Moreover, in addition to completing the check-box form, Dr. DeWan wrote an eight-page narrative explaining Legore's test results in detail, her behavioral observations, and her summary, recommendations, and functional barriers to Legore's employability. The ALJ's reason to discount Dr. DeWan's opinion is not legitimate.

I do not agree with Dr. DeWan's conclusion that he accommodated Legore's learning and cognitive disorders by limiting his ability to remember, understand, and carry out instructions and tasks which are generally required by occupations with an SVP of 1-2. The limitation addresses memory and understanding, not reading. Legore could perform these jobs if the instructions were given to him orally, but according to Dr. DeWan and Dr. Sacks, Legore could not read and comprehend written instructions which some jobs with an SVP of 1 or 2 might use. Legore's past work is fairly limited and, according to him, Freightliner accommodated his reading difficulties by giving him extra time to learn tasks. It is not even clear he earned a GED by hearing all the materials on tape. His situation is quite different from that in Bayliss v. Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005), where the claimant's long-term limitations did not prevent her from completing high school, obtaining a college degree, finishing a Certified Nurses' Aide training program, or participating in military training. Those activities are quite varied in nature, in comparison to Legore's past work of limited breadth.

In addition, the problems with the ALJ's rejection of Dr. Sacks' opinion apply equally forcefully to the ALJ's rejection of Dr. DeWan's opinion. Consequently, I find the ALJ did not

provide legitimate reasons supported by substantial evidence in the record to reject Dr. Sacks' opinion that Legore's reading and writing disorders would impede his ability to comprehend and respond to written instructions, learn and retain new information via written materials, and complete written tasks.

II.     Effect of Obesity

On May 3, 2011, the State's Vocational Rehabilitation Division completed a medical review of Legore and reported he was obese (5 feet 10 inches; 220 pounds; BMI: 31). Legore contends the ALJ improperly failed to consider the effect of his obesity on his ability to work. Legore relies on the opinions of some treating and reviewing physicians, as well as his caseworker and a vocational rehabilitation evaluator, who all opined Legore had limitations in lifting, carrying, sitting, standing, and squatting which would prevent him from performing the full range of medium work, as the ALJ found.

The Commissioner argues Legore's doctors mentioned he was overweight but never diagnosed him as obese, so his weight was not a medically-determinable impairment. More importantly, the Commissioner claims Legore points to no evidence of functional limitations associated with obesity or of its effect on his other limitation.

In considering obesity, the ALJ "will not make assumptions about the severity or functional effects of obesity combined with other impairments. Obesity in combination with another impairment may or may not increase the severity or functional limitations of the other impairment. We will evaluate each case based on the information in the case record." SSR 02-1p. Although some of the treating or examining physicians realized Legore was overweight or obese, none of them attributed any limitations to his excess weight. For example,

Page 12 - OPINION AND ORDER

Certified Physician's Assistant Pat Buckley examined Legore on September 17, 2012, observed he was overweight and had a current BMI of 35.87, counseled Legore that losing weight would improve his health, and gave him some general tips about appropriate diet and exercise. Obesity can, but does not necessarily, cause limitations. The medical record does not support any additional limitations or further consideration of the effect of Legore's obesity on his ability to work.

III.    Carpal Tunnel Syndrome

Legore claims the ALJ improperly failed to fully and fairly develop the record about his carpal tunnel syndrome. According to Legore, he consistently reported problems with gripping, numbness in his hands and arms, and pain with overhead reaching but the ALJ failed to order a nerve conduction study, as he stated he would at the hearing, to determine if Legore suffered from carpal tunnel syndrome.

The Commissioner disagrees with Legore's characterization of the ALJ's statement about ordering a nerve conduction study and notes the ALJ sent Legore for a consultative examination with Dr. Webster.

A Social Security ALJ has "a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." Widmark v. Barnhart, 454 F.3d 1063, 1068 (9th Cir. 2006) (internal quotation omitted).

At the hearing, the ALJ agreed to send Legore for a physical evaluation and stated he would ask the doctor to test for carpal tunnel syndrome, among other things. Dr. Webster subsequently examined Legore on December 28, 2012. In his report, Dr. Webster recites Legore's explanation of the history of his carpal tunnel problems, measured the range of motion

Page 13 - OPINION AND ORDER

in his wrists, tested his gross and fine motor skills and grip strength, and diagnosed dysethesias in both hands with a normal functional examination and no limitations.

A medically determinable impairment must be established through signs, symptoms, and medically acceptable clinical or laboratory findings but under no circumstances can be established through symptoms, namely the individual's own perception of the impact of the impairment, alone. Ukolov v. Barnhart, 420 F.3d 1002, 1005 (9th Cir. 2005). Here, the medical record does not establish carpal tunnel syndrome as a medically determinable impairment. The ALJ fulfilled his duty to develop the record by obtaining a physical evaluation of Legore to look for the problem. Thus, the ALJ did not commit an error.

IV.   Remedy

The court has the discretion to remand the case for additional evidence and findings or to award benefits. McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002). The court should credit evidence and immediately award benefits if the ALJ failed to provide legally sufficient reasons for rejecting the evidence, there are no issues to be resolved before a determination of disability can be made, and it is clear from the record that the ALJ would be required to find the claimant disabled if the evidence is credited. Id. If this test is satisfied, remand for payment of benefits is warranted regardless of whether the ALJ might have articulated a justification for rejecting the evidence. Harman v. Apfel, 211 F.3d 1172, 1178-79 (9th Cir. 2000).

The "crediting as true" doctrine resulting in an award of benefits is not mandatory in the Ninth Circuit, however. Connett v. Barnhart, 340 F.3d 871, 876 (9th Cir. 2003); Vasquez v. Astrue, 572 F.3d 586, 593 (9th Cir. 2009) (recognizing split within the circuit on whether the rule

is mandatory or discretionary but not resolving the conflict).  The court has the flexibility to remand to allow the ALJ to make further determinations, including reconsidering the credibility of the claimant.  Connett, 340 F.3d at 876.  On the other hand, "in the unusual case in which it is clear from the record that the claimant is unable to perform gainful employment in the national economy, even though the vocational expert did not address the precise work limitations established by the improperly discredited testimony, remand for an immediate award of benefits is appropriate."  Benecke v. Barnhart, 572 F.3d 586, 595 (9th Cir. 2004).

      Even if I credit Dr. Sacks' and Dr. DeWan's opinions that Legore is functionally illiterate, there is no vocational evidence in the record to determine if there are other jobs in the national economy he could perform.  The better course is to remand the case to allow the agency to specifically test Legore's reading and writing ability.  Based on a more complete residual functional capacity, this will allow a vocational expert to determine if there are jobs he can perform.

## CONCLUSION

      The decision of the Commissioner is reversed.  This action is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for rehearing to further develop the record as explained above.  Judgment will be entered.

      IT IS SO ORDERED.

      Dated this ___7th___ day of July, 2014.

      /s/ Garr M. King  
      Garr M. King  
      United States District Judge